**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

SUELLEN KLOSSNER,

        Plaintiff,

vs.

IADU TABLEMOUND MHP, LLC and
IMPACT MHC MANAGEMENT, LLC,

        Defendants.

No. 20-CV-1037-CJW-KEM

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................ 2

II.    PROCEDURAL HISTORY ................................................................. 2

III.   MOTION TO TAKE JUDICIAL NOTICE............................................ 3

IV.   DEFENDANTS' MOTION IN LIMINE.............................................. 5

V.    PLAINTIFF'S MOTION IN LIMINE.................................................. 7

VI.   FINDINGS OF FACT....................................................................... 8

VII.  CONCLUSIONS OF LAW.............................................................. 13

      A.    Whether the Accommodation is Necessary .................................... 14

      B.    Whether the Accommodation is Reasonable................................... 18

VIII. DAMAGES.................................................................................... 23

IX.   CONCLUSION ............................................................................... 24

# I.    INTRODUCTION

This matter is before the Court after a bench trial on plaintiff's Fair Housing Amendments Act ("FHAA") claim as pled in Count I of her complaint. On August 2–3, 2021, the Court held a bench trial on that claim. On August 24, 2021, the parties submitted simultaneous post-trial briefs. (Docs. 79 & 80). Also before the Court and related to the bench trial are defendants' Motion to Take Judicial Notice of Certain Adjudicative Facts (Doc. 61), defendants' Renewed Motion in Limine in which defendants seek to strike plaintiff's expert evidence (Doc. 65), and plaintiff's Motion in Limine in which she seeks to strike defendants' expert evidence (Doc. 66). For the following reasons, the **Court grants in part and denies in part** defendants' Motion to Take Judicial Notice, **denies** defendants' Motion in Limine, **denies** plaintiff's Motion in Limine, and **finds in favor** of plaintiff on plaintiff's FHAA claim.

# II.    PROCEDURAL HISTORY

On September 8, 2020, plaintiff filed her complaint against defendants in this Court. (Doc. 3). Plaintiff asserts claims for (1) violation of the FHAA, Title 42, United States Code, Section 3604(f)(3)(B), (2) violation of the Iowa Civil Rights Acts, (3) use of an illegal lease in violation of Iowa Code Section 562B.11(1), and (4) violation of the Consumer Fraud Act, Iowa Code Section 714H. (*Id.*, at 13–19). Plaintiff demanded a jury trial. Subsequently, the parties agreed to an expedited bench trial only on plaintiff's FHAA claim. (Docs. 21; 33-1, at 3–4).

As noted, in connection with the bench trial, defendants filed a Motion to Take Judicial Notice of Certain Adjudicative Facts (Doc. 61), and a Renewed Motion in Limine (Doc. 65), and plaintiff filed a Motion in Limine (Doc. 66). The Court will first rule on these pending motions, before turning to making findings of fact and conclusions of law.

### III.   MOTION TO TAKE JUDICIAL NOTICE

Defendants ask this Court to take judicial notice of three facts.

Fact A: Former City of Dubuque Housing Commissioner and current Dubuque City Council member, Brad Cavanaugh, and former Dubuque City Council member, Brett Shaw, have expressed a willingness to reassess whether a source-of-income protection ordinance might be warranted, citing a newspaper article.

Fact B: Jerry Maro, president of the Dubuque Area Landlords Association, and David Resnick, Dubuque City Councilmember, have expressed criticisms about a source-of-income ordinance, citing another newspaper article.

Fact C: On April 30, 2021, Iowa Governor Kim Reynolds signed Senate File 252 into law, enabling landlords to refuse to lease or rent to a person because of their use of a Section 8 housing choice voucher, citing a letter signed by Governor Reynolds.

(Doc. 61, at 1–2).

Federal Rule of Evidence 201 provides in pertinent part:

(b) **Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:
>    (1) is generally known within the trial court's territorial jurisdiction; or
>    (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(c) **Taking Notice.** The court:
>    (1) may take judicial notice on its own; or
>    (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

FED. R. EVID. 201(b)–(c).   It is well-established that the rule applies only to "adjudicative" facts.  As the Advisory Committee Notes explain, "[n]o rule deals with judicial notice of 'legislative' facts." *Id.*

> The omission of any treatment of legislative facts results from fundamental differences between adjudicative facts and legislative facts. Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body.

*Id.*; *see Qualley v. Clo–Tex Int'l, Inc.*, 212 F.3d 1123, 1128 (8th Cir. 2000); *United States v. Gould*, 536 F.2d 216, 219–220 (8th Cir. 1976) (citing the Advisory Committee Notes to Rule 201 with approval). Rule 201 is not the only way courts may take judicial notice, however. Courts may also take judicial notice of statutes and administrative regulations. *See, e.g.*, *Roemer v. Bd. Pub. Works*, 426 U.S. 736, 742 n.4 (1976); *Hoist v. Countryside Enter. Inc.*, 14 F.3d 1319, 1322 n.4 (8th Cir. 1994) ("Ordinarily, codes, regulations, and statutes are, if relevant, established through judicial notice."); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("[M]atters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice.").

Here, defendants first ask the Court to take judicial notice of Facts A and B, based on newspaper articles. Courts may properly take judicial notice of newspapers and other publications as evidence of what was in the public realm at the time, but not as evidence that the contents in the publication were accurate. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *Alliance Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006). Defendants are not asking the Court to take judicial notice of what was in the public realm, but rather, of the facts reported in the newspaper articles. This the Court cannot do. Thus, the Court denies defendants' motion to take judicial notice of Facts A and B.

In contrast, the Court will take judicial notice of the new Iowa law. That law appears to apply to residential dwellings, however, and not to manufactured home lot

rentals. Thus, the fact may not be relevant under Federal Rules of Evidence 401 and thus barred under Rule 402. Here, defendants have failed to show how a change in the Iowa law pertaining to housing choice vouchers applicable to residential dwellings is relevant to the issue being tried, that is whether defendants' failure to accept a housing choice voucher from the City of Dubuque for plaintiff's lot rental constitutes discrimination based on disability under the FHAA. Thus, the Court will take judicial notice but not consider Fact C in ruling on the merits of this trial on the FHAA claim.

Defendants also ask the Court to "exclude any testimony by Cavanaugh and Shaw as irrelevant," citing Federal Rules of Evidence 201(c)(2) and 402. Rule 201(c)(2) does not provide any basis to exclude testimony or other evidence. Even if a Court takes judicial notice of fact, that does not bar other evidence on that same fact. In any event, plaintiff did not call Cavanaugh as a witness at trial, and thus defendants' motion is moot as to him. Plaintiff did call Shaw to testify and the Court allowed his testimony over defendants' objection. Shaw testified about a number of matters, some of which the Court found relevant and helpful and others that were not helpful. Defendants objected to some of his testimony as irrelevant and the Court sustained defendants' objections in part. Defendants' attempt to seek a blanket exclusion based on relevance as part of their motion to take judicial notice, however, is too broad and failed to be tailored to any specific evidence. Thus, to the extent defendants are maintaining this request to exclude the entirety of Shaw's testimony, the request is denied.

In short, the Court grants in part and denies in part defendants' Motion to Take Judicial Notice of Certain Adjudicative Facts.

## IV.    DEFENDANTS' MOTION IN LIMINE

Defendants filed a motion in limine to bar the testimony of plaintiff's expert, Douglas L. Major-Ryan ("Ryan"). (Doc. 33). The Court granted in part and denied in part defendants' motion. (Doc. 47). Specifically, the Court granted defendants' motion

to the extent that it barred Ryan from opining that plaintiff's requested accommodation was reasonable, finding it to be a legal conclusion. (Doc. 47, at 14). The Court denied defendants' motion to the extent defendants sought to bar Ryan from opining about whether the requested accommodation constituted an undue burden. (*Id.*, at 14, 16). Following the Court's ruling, defendants deposed Ryan. (Doc. 65, at 2).

On the eve of trial, defendants filed a Motion to Renew Their Motion to Strike or Exclude Expert Ryan's Opinions and Testimony. (Doc. 65). At the start of the trial, the Court announced that it would take that motion under advisement and rule upon it as part of its ruling on the merits of the claim. In their renewed motion, defendants argue that whether the requested accommodation could constitute an undue burden "pertains directly to one of the elements required to establish Plaintiff's failure-to-accommodate claim" and therefore concludes Ryan's opinions on this issue "are inadmissible legal conclusions as to a particular element of Plaintiff's failure-to-accommodate claim, in particular, and whether Defendants violated the [FHAA], in general." (Doc. 65, at 3). Defendants did not cite any caselaw in which a court barred an expert from opining on whether a requested accommodation constituted an undue burden.

That Ryan's opinion pertains to an element of the claim does not mean it is a legal conclusion. Indeed, if his opinion did not pertain to an element of the claim it would likely be irrelevant. Whether the requested accommodation would constitute a significant burden is a question of fact. It requires an understanding of how the accommodation may impact the landlord financially and otherwise. At trial, Ryan testified as a factual matter about the obligations of a housing provider participating in the Housing Choice Voucher Program. (Tr., at 107–109). Ryan did not opine that the Housing Choice Voucher Program created an "undue" burden for housing providers; rather, he opined that it was "not burdensome." (*Id.*, at 109–110). He then went on to explain facts and data that led him to that opinion. (*Id.*, at 110–13). Last, Ryan applied factors considered

by the Department of Housing and Urban Development as it related to this case as further support for his opinion that it would not be burdensome for defendants to participate in the Housing Choice Voucher Program for plaintiff. (*Id.*, at 113–23). Whether the accommodation was reasonable given that burden is for the Court to decide.

Thus, the Court denies defendants' motion in limine seeking to bar Ryan's testimony.

## V.    PLAINTIFF'S MOTION IN LIMINE

Plaintiff sought to bar the testimony of defense expert Robert S. Griswold ("Griswold") asserting that he was "not qualified to opine about the housing discrimination issue in this case," and that his opinions did "not adhere to the standards of reliability mandated by the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), or the Federal Rules of Civil Procedure." (Doc. 66-1, at 1). Specifically, plaintiff argues that "Griswold's experience in the mobile home sector is sparse, he has no property management experience in Iowa, and he is unfamiliar with the Dubuque Housing Authority." (*Id.*, at 5). Plaintiff further argues that Griswold's opinion is based on "speculation" without reference to the standard of care, and "lack[s] foundation" because he "ignores facts that undercut his analysis." (*Id.*, at 7–11). Finally, plaintiff argues that Griswold's opinions are irrelevant. (*Id.*, at 12–15).

There is little purpose in bench trials for so-called *Daubert* motions to bar admission of expert testimony because "[t]he main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). *See also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (stating that when a court sits as the finder of fact "there is less need for the gatekeeper to keep the gate") (alteration and citation omitted). Moreover, as the Supreme Court made clear in *Daubert*,

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *See also Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) ("[I]t is up to the opposing party to examine the factual basis for [an expert's] opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.") (internal quotation marks and citation omitted).

Here, plaintiff argues that Griswold's opinions are irrelevant because they pertain to burdens on property owners not applicable to plaintiff, relate to financial burdens when defendants are not claiming financial burden, and for other reasons. (Doc. 66-1, at 12–15). In her motion in limine, plaintiff did not challenge Griswold's qualifications, his methodology, or the basis for his opinions. At trial, plaintiff did not object once to Griswold's testimony on the ground that it was irrelevant. Although perhaps part of his report was irrelevant to the issues at trial, the testimony at trial was relevant.

Thus, the Court denies plaintiff's motion in limine seeking to bar Griswold's testimony.

## VI.    FINDINGS OF FACT

Plaintiff is a resident of Iowa, defendant IADU Table Mound MHP, LLC ("IADU Table Mound") is a Colorado limited liability company, and defendant Impact MHC Management, LLC ("Impact MHC") is a Wyoming limited liability company. IADU Table Mound, which is controlled by Impact MHC, owns and operates a mobile home park named Table Mound ("the Park") in Dubuque, Iowa. IADU Table Mound purchased the Park in June 2017.

For several years in the mid-2000s, plaintiff lived in an eight-unit apartment. (Tr., at 13, 28). Plaintiff described her apartment as being located in a bad area of town where she felt unsafe. (Tr., at 13–14). In 2009, plaintiff purchased a mobile home at the Park.

(Tr., at 13–14). Plaintiff owns her home, but rents the land beneath it. (Tr., at 8–9, 12).

In 2009, plaintiff paid $235 a month in rent to the Park's prior owner. (Tr., at 15). Her rent increased until 2017 when she was paying $280 a month in rent to the prior owner with water, sewer, and trash included. (Tr., at 15–16). When defendants purchased the Park in 2017, they increased plaintiff's lot rent to $320 a month. (Tr., at 16, 196). In 2018, defendants increased plaintiff's lot rent again and began separately charging plaintiff for water, sewer, trash, and meter rental expenses. (Tr., at 16–17). In September 2019, defendants increased plaintiff's lot rent to $380 a month and increased the trash collection fee.[1] (Tr., at 16–17, 198).

Decades ago, plaintiff was employed, but has since developed both psychiatric and physical impairments that prevent her from working, at least full-time. (Tr., at 11–12, 38, 51, 58). Plaintiff apparently worked some after she was declared disabled in 1993. (Tr., at 27–28). Plaintiff presented no evidence at trial about her income before she became disabled or her income from part-time employment after she became disabled. Plaintiff is able to live independently, however, and receives income from Social Security and food assistance benefits. (Tr., at 9, 12, 16, 27). Plaintiff is a person with a "handicap" as defined by Title 42, United States Code, Section 3602(h). Defendants have been aware of plaintiff's disabilities. (Tr., at 24).

In late 2019, plaintiff had a plumbing problem, compelling her to seek financial assistance from the St. Vincent de Paul Society, which paid part of her rent for one month. (Tr., at 17–18). Defendants accepted that assistance payment. (Tr., at 17–19).

---

[1] Although the implication is that defendants have unfairly or unreasonably increased plaintiff's rent and expenses, plaintiff's witnesses testified that the charges are consistent with the market rate in the Dubuque area. (Tr., at 196, 202). Plaintiff concedes "[t]here is no evidence in the record to suggest that Table Mound is not charging a reasonable rent." (Doc. 79, at 9).

In November 2019, the City of Dubuque approved a measure allowing the Dubuque Housing Authority ("DHA") to issue housing choice vouchers to residents of the Park to assist them in paying their rent and utilities. (Tr., at 140–42). The housing choice voucher program is federally funded but administered by local housing authorities like the DHA. (*Id.*, at 142). In January 2020, plaintiff applied and was approved for a housing choice voucher through the DHA. (Tr., at 142–43). If accepted by defendants, the voucher would limit plaintiff's rent obligation to 30% of her income with the remainder paid by DHA. (Tr., at 144, 207–208).

Plaintiff asked defendants to accept the housing choice voucher. (Tr., at 23–24). That is the only accommodation she requested. (Tr., at 29). Defendants declined to accept the voucher, asserting that they refused to accept Section 8 housing. (Tr., at 23). Defendants offered to provide plaintiff with a referral to other mobile home parks in the area that did accept housing choice vouchers and to locate a moving company for her. (Exhibits 10 & 11). Plaintiff continued to pay her rent through November 2020 without the voucher assistance and despite being unemployed due to her disability. (Tr., at 206–207; Exhibit D).[2]

Plaintiff testified that she is not able to move her mobile home due to its age and condition, that she has been unsuccessful in finding a buyer for her home, and that her disabilities and the COVID-19 pandemic have hindered her efforts to find another suitable residence. As for moving her home, plaintiff testified that in her opinion it was too old to move. (Tr., at 31–33). But plaintiff did not actually have anyone tell her that or evaluate the ability to move her home, and offered no other evidence at the trial to prove that the home could not be moved. (Tr., at 32–33). Dave Reynolds, President and CEO

---

[2] In November 2020, the parties reached an agreement that would allow plaintiff to afford her rent for the pendency of the litigation. (Doc. 79, at 11).

of defendant Impact, testified that it is possible to move a home as old as plaintiff's home to another mobile home park. (Tr., at 220). Other mobile home parks in the Dubuque area accept housing choice vouchers. (Tr., at 72–73, 161, 164). As to the cost of moving her home, at trial both parties presented some evidence that it would cost approximately $10,000. (Tr., at 122, 214). As to selling her home, plaintiff briefly listed her home for sale. (Tr., at 29–30). She received two or three calls, including from someone interested in buying it "right away," but plaintiff "couldn't come up with a price for it." (*Id.*). Plaintiff admitted that, "the bottom line is, I really didn't want to sell my home." (Tr., at 30). Last, as for looking for alternative housing, plaintiff's mental health nurse practitioner, Elizabeth Brimeyer, testified that plaintiff's condition was "severe" and "not stable" and that plaintiff "would not do well" living in a multi-family housing setting. (Tr., at 40, 48). Plaintiff also testified that she quit looking for alternative housing because of her fear of the COVID-19 pandemic. (Tr., at 21).

The Dubuque Housing and Community Development Department, the local public housing agency ("PHA"), is in charge of administering the housing choice voucher program in Dubuque. (Tr., at 139–40, 157, 270–71). It must comply with the Housing and Urban Development ("HUD") requirements for the program, including those contained in the Housing Assistant Payment Contracts ("HAP contract") entered into between the PHA and a landlord participating in the program. (Tr., at 145–56, 158). There is an HAP contract specifically drafted for manufactured home lot rental agreements. (Exhibit 7). The PHA must inspect the property, ensure it meets the housing quality standards, and determine that the rent and expenses are reasonable. (Tr., at 143–44, 148, 164–65). When a mobile home is involved, if the renter fails to maintain the home as required by HUD regulations, the landlord's voucher payment may be in jeopardy. (Tr., at 134, 160–61). The HAP contract requires a year-long lease. (*Id.*, at 275, 276–78). They also do not allow rent to increase during the lease period. (Tr., at

278).  Defendants also interpret the contract as limiting the ability of a landlord to terminate or not renew a lease except for good cause.  (Tr., at 281, 283–84).

Defendant Impact has a policy of not participating in housing choice voucher programs except in states where it is required to do so by law, or when it has purchased properties in which prior owners accepted such vouchers and defendant has "grandfathered in" such tenants.  (Tr., at 208–12, 281–94).  Iowa has no such law requiring landlords to accept vouchers.  Defendant Impact owns mobile home parks in two states that require landlords to accept housing choice vouchers.  (Tr., at 118, 208, 210).  Of the more than 20,000 tenants defendant Impact manages, approximately 40 are Section 8 voucher participants.  (Tr., at 210–11).

Defendant Impact has a policy against accepting vouchers because of the burdens defendant believes participation in the program carries.  Dave Reynolds testified that he believed participating in the program involves administrative duties and burdens, such as (1) additional contracts; (2) extra administrative work; (3) inefficiencies of recordkeeping, tracking multiple rent payments, imposing late fees, raising rents, and enforcing rules; (4) difficulties working with multiple housing authorities in different locations; (5) the need to enforce two contracts (the HAP contract and the tenant's lease contract) which may be in conflict; (6) decreased control over ensuring the home is maintained and incurring expenses of moving the home if the resident loses the voucher assistance because the house was not maintained; (7) an additional $50 to $100 expense of keeping track of the two contracts; and (8) the limited "for cause" termination limitation in the HAP contract.  (Tr., at 209–10, 212–18, 234–36, 251–53).  Defendants' expert, Robert Griswold, also identified as additional burdens (1) the significant delay in voucher payments during the pandemic, (2) the difficulty of scheduling inspections with housing authorities, and (3) the requirement of a landlord to treat equally every resident

asking for the same accommodation if the landlord grants the accommodation to one resident. (Tr., at 274, 288–89, 291–92, 296).

## VII. CONCLUSIONS OF LAW

The FHAA prohibits housing discrimination on the basis of an individual's "handicap." 42 U.S.C. § 3604(f). Under the FHAA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . . that person." 42 U.S.C. § 3604(f)(2). A plaintiff may prove a violation of the FHAA under three theories of discrimination: "intentional discrimination, discriminatory impact, or refusal to make reasonable accommodation." *Hevner v. Village East Towers, Inc.*, 06 Civ. 2983 (GBD) (FM), 2010 WL 11680173, at *6 (S.D.N.Y. Dec. 17, 2010) (internal quotation marks omitted). Under the reasonable accommodation theory, a landlord may not "refus[e] to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such [handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The federal regulations provide, as examples of reasonable accommodation, providing an exception to a "no pets" policy to allow a blind tenant to have a seeing-eye dog, or exempting a disabled person from a "first-come, first-serve" parking policy to permit the disabled person to park near the entrance. 24 C.F.R. § 100.204(b). "[A] 'necessary' accommodation is one that alleviates not 'handicaps' *per se*, but rather 'the *effects* of' those handicaps." *Schaw v. Habitat for Humanity of Citrus Cnty, Inc.*, 938 F.3d 1259, 1269 (11th Cir. 2019) (first and third quoting *Bhogaita v. Altamonte Heights Condo. Assoc.*, 765 F.3d 1277, 1288 (11th Cir. 2014)). In other words, in the example above it is not the blindness that the landlord would be accommodating, it is the effect of that blindness—the need for a seeing-eye dog as an exception to the rule barring pets—that the landlord would be accommodating.

13

To make a failure-to-accommodate claim under a Section 3602(a) of the FHAA, plaintiff must prove four things: (1) she is handicapped within the meaning of the FHAA and defendants were aware of the handicap; (2) her requested accommodation is necessary for her to use and enjoy the dwelling; (3) her accommodation request is reasonable; and (4) defendants refused to make the requested accommodation. *Fair Hous. of the Dakotas, Inc., v. Golmark Prop. Mgmt.*, 778 F. Supp. 2d 1028, 1034 (D. N.D. 2011); *see also Edwards v. Gene Salter Props.*, No. 4:15CV00571, 2019 WL 2651109, at *3 (E.D. Ark. June 27, 2019) (stating elements of Section 3602(a) claim). Here, the parties agree that plaintiff has presented evidence that met the first and last elements of the claim, but dispute whether plaintiff has proved the second and third elements. Plaintiff bears the burden of showing her requested accommodation is necessary for her to use and enjoy the dwelling. *See Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995) (stating that plaintiff has the burden of "showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability"). Plaintiff also has the burden to show the accommodation is reasonable on its face. *U.S. Airways, Inc., v. Barnett*, 535 U.S. 391, 401–402 (2002). If plaintiff makes such a prima facie showing, then defendants have the burden of proving the accommodation is unreasonable or would impose an undue hardship. *Id.*, at 402. The Court will address each of the disputed elements in turn.

### A.     *Whether the Accommodation is Necessary*

An accommodation is "necessary" within the meaning the FHAA if it provides a "direct amelioration of a disability's effect." *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains*, 284 F.3d 442, 460 (3rd Cir. 2002) (quoting *Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 604 (1997)). Here, plaintiff's disabilities prevent her from working. As a result, she is on a fixed income limited to government aid that is insufficient to pay the market rent from her own resources. The

requested accommodation is that defendants be required to accept the housing choice vouchers so as to make up the shortfall between her income and her rent obligation.

Defendants argue that the accommodation is not necessary to directly ameliorate plaintiff's disability but, rather, to ameliorate her lack of income. Defendants rely primarily on decisions from the Second and Seventh Circuit Courts of Appeals, while plaintiff relies primarily on a decision by the Ninth Circuit Court of Appeals. In *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir. 1998), the court held that a landlord's refusal to accept housing vouchers did not violate the FHAA because "[e]conomic discrimination—such as the refusal to accept Section 8 tenants—is not cognizable as a failure to make reasonable accommodations, in violation of § 3604(f)(3)(B)." In *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999), the court held that a municipality did not have to "accommodate" a builder who wanted a variance from zoning laws to build housing for disabled people when the basis was to provide less expensive housing for them. In *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1154–55 (9th Cir. 2003), the court rejected the reasoning in *Salute* and *Hemisphere*, holding that a landlord must accommodate a disabled person's request to allow his mother to co-sign the lease when his disability prevented him from working and therefore prevented him from meeting the landlord's minimal income requirement. The parties have cited a number of additional out-of-circuit and district court decisions pro and con that have directly or indirectly addressed the fundamental question of whether an accommodation is "necessary" when the effect of the disability prevents a tenant from working and thus affording the rent without assistance or some other type of accommodation.[3] In other words, these cases address with varying degrees of clarity the question of whether an accommodation may be required to remedy the

---

[3] *See* Doc. 79, at 14–15; Doc. 80, at 12 & n.2.

economic impact of a disability. The Eighth Circuit Court of Appeals, however, has never addressed this issue.

The limited case law in this area reflects a tendency to meld the analysis of economic accommodation between the elements of "necessity" and "reasonableness." For example, the *Salute* court appears to have rejected the accommodation as not necessary because it did not directly address a disability, but then went on to note in support of its ruling the unreasonable burdens facing a landlord participating in a voucher program. *Salute*, 136 F.3d at 301. The parties have similarly melded the analysis in their briefing.

The Court finds that the question of whether the accommodation is one addressing an economic disadvantage versus an economic effect of a disability to fall squarely under the "necessity" element. It is here that a plaintiff must show a nexus between a disability and the accommodation. Only if that nexus is shown does the Court address the question of whether the accommodation is reasonable.

Here, the Court finds that plaintiff has met her burden of showing that the accommodation is necessary to ameliorate the effect of her disability. That is, she has shown a nexus between her disability and the accommodation that the landlord accept supplemental funds from another source, so she can afford her rent. Plaintiff has proved that her disability has prevented her from working. Her inability to work limits her income. Her limited income prevents her from paying her entire rent from her own limited resources. Thus, an accommodation that would allow her to supplement her rent payments through another funding source is necessary to ameliorate the effect of her disability; her inability to work to earn enough money to pay her rent.

In reaching the legal conclusion that plaintiff has carried her burden of showing a nexus between her requested accommodation and the effect of her disability, the Court relies on the Supreme Court's reasoning in *Barnett* and its implied rejection of Justice

Scalia's "but for" nexus he proposed in his dissenting opinion. Although *Barnett* involved the Americans With Disabilities Act ("ADA"), the legal reasoning regarding accommodations of disabilities is the same. *See Schaw*, 938 F.3d at 1265 n.2 (noting that the caselaw addressing reasonable accommodations under the FHAA is "rather thin," the court can look to the caselaw under the ADA for guidance). In *Barnett*, the Supreme Court held that accommodations (1) may require providing preferential treatment to disabled people over those similarly situated but not disabled and (2) are not limited only to lowering barriers created by the disability itself. *Barnett*, 535 U.S. at 395–98. Here, what that means is that defendants must accommodate plaintiff's disability by accepting a voucher although there may be other nondisabled people unable financially to pay rent at the Park who would similarly benefit from defendants' acceptance of vouchers. It also means that plaintiff need not show that the requested accommodation lowers a barrier created by her disabilities itself so long as she can show that it lowers a barrier created by the effect of her disability; that is, her inability to work. In short, the Court finds "that the FHAA allows consideration of a disabled person's financial circumstances when determining whether an accommodation is legally necessary, not that the FHAA required financial accommodations for disabled tenants." *Fair Hous. Rights Cent. in Se. Pa. v. Morgan Props. Mgmt. Co.*, No. 16-4677, 2018 WL 4489653, at *3 (E.D. Penn. Sept. 19, 2018).[4]

The Court makes its factual finding of necessity with some hesitancy, though. Plaintiff's evidence on the issue of her ability to pay was weak. Plaintiff did not present evidence of how much money she earned when she was employed prior to her disability.

---

[4] Although the reasoning of *Salute*—"that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps"— is facially appealing, especially when it involves the voluntary housing voucher program, *Salute* was decided before *Barnett* and its broad holding appears to this Court to be inconsistent with *Barnett's* holding. *Salute*, 136 F.3d at 301.

Thus, it is theoretically possible that she could not have afforded the current rent even if she was fully employed in her prior profession. Nor did plaintiff present evidence of how much money she earned when she worked part-time after she was declared disabled, or why she is currently unable to work part-time. Additionally, plaintiff was able to pay her increased rent through November, despite her inability to work due to her disability. Nevertheless, plaintiff presented enough evidence—and there was no evidence to the contrary—for the Court to find by a preponderance of the evidence—that is, it is more likely true than not—that but for plaintiff's disability she could work and earn enough money to pay her rent.

Thus, the Court finds plaintiff has proved by a preponderance of the evidence that her requested accommodation is necessary to ameliorate the effect of her disability.

### B.    *Whether the Accommodation is Reasonable*

Having found that plaintiff has proved the second element of her claim, the Court now turns to whether she has presented a prima facie case that her requested accommodation is reasonable and whether defendants have proven that it would be an undue hardship.[5] An accommodation is reasonable if it seems reasonable on its face or in the mine run of cases. *Barnett*, 535 U.S. at 401. A landlord can show an otherwise reasonable accommodation to constitute an undue hardship by proving it would impose an "undue burden" or result in a "fundamental alteration" of its program. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008). Determining whether a requested accommodation is reasonable requires a weighing of the respective costs and

---

[5] As the Eleventh Circuit Court of Appeals has noted, although there is overlap in this burden-shifting analysis, it remains that plaintiffs must make a prima facie showing of reasonableness, while showing that the accommodation is an undue hardship is an affirmative defense for which defendants bear the burden of proof. *Schaw*, 938 F.3d at 1265 n.3 (citations omitted).

benefits flowing from the accommodation, "a balancing of the parties' needs." *Bhogaita*, 765 F.3d at 1288 (citation omitted).

On its face, plaintiff's requested accommodation seems reasonable. The landlord will be paid rent and expenses in full, under plaintiff's requested accommodation, but only part of the payment will come from plaintiff while the rest comes from another source. Under plaintiff's proposed accommodation, the landlord need not decrease the rent or incur any obvious expenses.[6] The requested accommodation would not commit the landlord to offer Section 8 housing to anyone who asked, but only to others, like plaintiff, who could show that it would accommodate the effects of a legitimate disability. Plaintiff's expert, Mr. Ryan, testified that the costs of accepting vouchers in the manufactured home setting are minimal, based on his study of other states where the voucher program is required, and would be so for defendants given their financial position. (Tr., at 111, 114–16, 120). Thus, the Court finds plaintiff has carried her initial burden of showing the requested accommodation is reasonable in the mine run of cases.

In turning to whether the accommodation imposes an undue hardship, and particularly whether it would fundamentally alter defendants' policy of not accepting Section 8 vouchers, the Court begins by focusing on the fundamental nature of the housing choice voucher program and the reasons why landlords may choose not to participate in such programs. It is important to recognize as an initial matter that Congress chose to make the voucher program voluntary for landlords. In that congressional decision lies a recognition that participation in the program carries burdens that landlords may find too significant to overcome the benefits of participation.

---

[6] Defendants claimed that the cost of processing two contracts instead of one would cost $50 to $100 a year, but presented no evidence of how they arrived at this costs estimate.

Although Congress has amended the housing voucher program to remove some of the more burdensome provisions (for example, the take-one, take-all provision), the voucher program nevertheless remains a voluntary program in which landlords need not participate.

The burdens of participating in the program can be substantial. Or, as the Second Circuit Court of Appeals observed, "the burden of participating in the Section 8 program" does not involve "only reasonable costs or insubstantial burdens." *Salute*, 136 F.3d at 301. The *Salute* court noted that participation in the program may entail "financial audits, maintenance requirements, inspection of the premises, reporting requirements, [and an] increased risk of litigation." *Id*. Here, defendants presented proof that accepting vouchers for plaintiff could impose significant burdens on them. Among them is the requirement that defendants enter into a separate contract with the public housing authority with material terms (such as the length of the lease) that conflict with the contract they entered into with plaintiff. So, too, the provision in the HAP contract that requires defendants to renew the lease absent good cause is significant. The so-called administrative burdens defendants identified (keeping track of two rent payments, for example) are vague and insignificant in nature. Others are at best speculative or temporary, such as the possible difficulties in scheduling inspections of the property and the delays in voucher payments some landlords apparently experienced during the COVID-19 pandemic. The Court recognizes that defendants also identified some risks that the voucher program could impose on a landlord that would be out of the landlord's control. In particular, the evidence showed that if the tenant failed to keep the mobile home repaired in the manner required by the voucher program, the public housing authority could cease payments even though the landlord would have no ability to remedy the problem. Thus, defendants have identified some burdens of participating in the program.

In considering whether these burdens create an undue hardship, the Court cannot ignore that defendants operate properties in which they accept vouchers, albeit very few. Defendants operate properties in which they accept vouchers when required by law, and when they have purchased properties where the prior owners allowed vouchers and defendants have continued to accept them from the tenants considering them "grandfathered in" despite defendants' policy not to accept vouchers. Thus, defendants have shown themselves capable of participating in housing voucher programs. Defendants presented no evidence that doing so under these other exceptions created undue hardship upon them. Here, plaintiff is seeking another exception for a disabled person unable to work and pay the rent. The Court also notes that defendants' ability and willingness to accept a check from the St. Vincent de Paul Society on behalf of plaintiff shows that accepting more than one check for rent does not pose a significant burden on defendants.

In looking at the balance of the costs and benefits of the requested accommodation, the Court must also consider the alternatives and their costs and benefits. Here, plaintiff presented only her uncorroborated, but controverted, testimony that her home is too old to move. Nevertheless, the largely uncontested estimate of $10,000 to move her home to another park that accepted vouchers appears to be a sufficiently significant economic hurdle that it does not appear feasible for plaintiff given that her disability prevents her from working to pay such a large sum.[7] Plaintiff also presented virtually no evidence that she ever seriously attempted to sell her home or find alternative housing. Her attempts to sell her home were not conducted in good faith or with an effort to sell; plaintiff even admitted she had no intention of selling her home. As to finding alternative

---

[7] Indeed, defendants consider the costs of moving a mobile home from the park to be a burden for them, let alone for a disabled person with limited income. *See* Doc. 80, at 10 (listing cost of moving mobile home among burdens of participating in the voucher program).

housing, plaintiff cited her fear of the COVID-19 pandemic and testimony by her nurse practitioner that plaintiff is currently in an unstable mental state such that moving would be difficult.

Last, in weighing the costs and benefits of granting plaintiff's requested accommodation, the Court must consider whether doing so would open the floodgates and subject defendants to a flood of voucher requests. Mr. Reynolds testified that "if you are doing one thing for one person, then you have to do it for everyone per, you know, the Fair Housing guidelines." (Tr., at 227). Similarly, defendants' expert Robert Griswold testified that when a landlord allows one resident to use a Section 8 housing choice voucher as an accommodation, the landlord must treat any other tenant requesting the same accommodation in the same manner. (Tr., at 291–92). In Mr. Griswold's opinion, "you are either in the program or you're not in the program." (Tr., at 292). But later he testified that he could not opine on whether accommodating plaintiff would require defendants to accommodate others with similar claims. (Tr., at 296–97). Plaintiff points out, however, that the so-called "take one, take all" requirement provision in the FHAA was repealed in 1996. *See* Doc. 79, at 22 (citing Publ. L. No. 104-134, § 203(a), (d), 110 Stat. 1321 (1996)). Relying on this change in the law, plaintiff's witnesses rejected the notion that defendants would be obligated to accept voucher requests for other tenants simply as a result of accepting a voucher for plaintiff. (Tr., at 85, 152). The Court is persuaded that granting plaintiff's requested accommodation here would not obligate defendants to accept vouchers for any tenant who requested one any more than accepting vouchers for those defendants grandfathered in when they purchased other parks obligated them to accept vouchers for any tenant who requested one. To be sure, if another tenant who is disabled and unable to work requests an accommodation under similar circumstances, defendants will have to consider whether the FHAA requires it to grant the accommodation. That determination will turn on the facts of each case,

just as this determination has. In short, the Court finds no basis to conclude that granting plaintiff's accommodation here will subject defendants to a flood of tenants for whom they must accept vouchers.

Having considered the burdens of accommodating plaintiff by accepting a housing voucher for part of her rental payment, and weighing the costs and benefits of defendants participating in the program to this limited extent and under this exceptional situation, the Court finds that defendants have failed to show that doing so will create an undue hardship. Thus, the Court finds in favor of plaintiff on her FHAA claim.

## VIII. DAMAGES

Having found in favor of plaintiff on her FHAA claim, the Court must now consider the relief to which she is entitled. The Court's finding mandates that at the very least the Court order defendants to accept plaintiff's housing choice voucher for so long as she is unable to work because of her disability. Plaintiff also seeks compensatory damages as well, however. She seeks "$35,000 for the emotional distress she has experienced as a result of Defendants' unlawful refusal to reasonably accommodate her." (Doc. 79, at 28). Defendants point out that plaintiff failed to present evidence that her mental distress was related to the refusal to grant her requested accommodation. (Doc. 80, at 26). The Court agrees. Plaintiff presented evidence through her healthcare provider that plaintiff suffered emotional distress because of the increase in rents and the pandemic, and that she is in an unstable mental state and that moving would cause her to get worse, but provided no testimony that defendants' refusal to accommodate her caused her additional emotional distress. Even if plaintiff had presented such evidence, the Court would not award damages for emotional distress. Defendants here have acted in good faith. The law in this area is far from clear—as noted in this opinion there is a circuit split on the issues before the Court—and defendants reached an agreement with plaintiff about rent pending trial in this matter.

Thus, the Court will enjoin defendants by ordering them to accept plaintiff's housing choice voucher, but will not award plaintiff compensatory damages.

## IX.    CONCLUSION

For the reasons stated, the Court:

1.    **Grants in part and denies in part** defendants' Motion to Take Judicial Notice of Certain Adjudicative Facts (Doc. 61);

2.    **Denies** defendants' Renewed Motion in Limine in which defendants seek to strike plaintiff's expert evidence (Doc. 65);

3.    **Denies** plaintiff's Motion in Limine in which she seeks to strike defendants' expert evidence (Doc. 66);

4.    **Finds in favor of plaintiff** on her FHAA cause of action.  Defendants are **ordered** to accept plaintiff's housing choice voucher, but plaintiff is not awarded money damages on this claim.

5.    **Orders** the parties to submit, within 14 days of this Order, a proposed scheduling order and discovery plan on the remaining Iowa causes of action.

**IT IS SO ORDERED** this 5th day of October, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa